UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| TYCO FIRE PRODUCTS LP,<br><br>*Plaintiff*,<br><br>v.<br><br>AIU INSURANCE COMPANY, *et al.*<br><br>*Defendants*. | Civil Action No. 2:23-cv-02384-RMG<br><br>Hon. Richard M. Gergel |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST AIG ON DEDUCTIBLES AND RETENTIONS**

March 18, 2024

WILLS MASSALON & ALLEN LLC

Christy Ford Allen (SC Bar 07549)
Post Office Box 859
Charleston, South Carolina 29402
Tel:    (843) 727-1144
Email: callen@wmalawfirm.net

COVINGTON & BURLING LLP

Allan B. Moore (admitted *pro hac vice*)
Timothy D. Greszler (admitted *pro hac vice*)
Alexis N. Dyschkant (admitted *pro hac vice*)
850 Tenth Street, NW
Washington, DC 20001
Tel:    (202) 662-5575
Email: abmoore@cov.com

*Counsel for Plaintiff Tyco Fire Products LP*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

I.      Amounts Paid Under Primary Policy Deductibles Erode Primary Policy Limits. ............. 5

II.     Pollution Exclusion Endorsement SIRs in the Post-1999 Umbrella Policies Do
        Not Apply................................................................................................................ 8

        A.      The SIRs in the Umbrella Policy Pollution Exclusion Endorsement SIRs
                Do Not Apply Because Those Endorsements Do Not "Grant" the Product
                Liability Coverage at Issue Here.............................................................. 9

        B.      The Umbrella Policies' Structure and Language Support This Result. ................ 11

        C.      The SIRs in the Umbrella Policy Pollution Exclusion Endorsement SIRs
                Do Not Apply Because the AFFF Claims Are Covered by Underlying
                Insurance. ................................................................................................ 15

III.    Umbrella Policy Retained Limits Do Not Apply in Certain Policy Periods and, in
        Any Event, Can Be Satisfied by Underlying or Other Insurance. .................................... 16

        A.      The Retained Limits in the 2001 and 2002 Umbrella Policies Do Not
                Apply Because AIG Did Not Specify Such Limits in These Policies. ................ 17

        B.      Retained Limits Can Be Satisfied by Underlying Insurance or Other
                Insurance, Which Affords Coverage Here............................................... 17

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Auto Owners Ins. Co. v. Benjamin,*
   781 S.E.2d 137 (S.C. Ct. App. 2015)...............................................................................10, 17

*Auto-Owners Ins. Co. v. Cincinnati Ins. Co.,*
   395 F. Supp. 3d 686 (D.S.C. 2019).........................................................................................17

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)..................................................................................................................4

*Cont'l Cas. Co. v. Amerisure Ins. Co.,*
   886 F.3d 366 (4th Cir. 2018) ...................................................................................................5

*Day v. Allstate Indem. Co.,*
   798 N.W.2d 199 (Wis. 2011)............................................................................................10, 17

*Donaldson v. Urban Land Interests, Inc.,*
   564 N.W.2d 728 (Wis. 1997)....................................................................................................5

*Gerdau Ameristeel US Inc. v. Zurich Am. Ins. Co.,*
   2021 WL 7691816 (S.D. Fla. July 26, 2021)..........................................................................14

*Greenville Cty. v. Ins. Reserve Fund,*
   443 S.E.2d 552 (S.C. 1994) ......................................................................................................5

*Harbor Ct. Assocs. v. Kiewit Const. Co.,*
   6 F. Supp. 2d 449 (D. Md. 1998)............................................................................................10

*Housing Grp. v. Cal. Ins. Guarantee Ass'n,*
   47 Cal. App. 4th 528 (Cal. Ct. App. 1996) ........................................................................12, 18

*IMO Indus., Inc. v. Transamerica Corp.,*
   101 A.3d 1085 (N.J. Super. Ct. App. Div. 2014)......................................................................6

*K & L Homes, Inc. v. Am. Family Mut. Ins. Co.,*
   829 N.W.2d 724 (N.D. 2013) .................................................................................................10

*Lexington Ins. Co. v. RLI Ins. Co.,*
   949 F.3d 1015 (7th Cir. 2020) ..................................................................................................6

*McMillin Mgmt. Servs., L.P. v. Fin. Pac. Ins. Co.,*
   17 Cal. App. 5th 187 (2017) ...................................................................................................14

*Monroe Guar. Ins. Co. v. Langreck,*
   816 N.E.2d 485 (Ind. Ct. App. 2004)........................................................................................6

*Northland Ins. Co. v. Am. Home Assurance Co.*,
   689 S.E.2d 87 (Ga. Ct. App. 2009) ..........................................................................8

*Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*,
   368 F. Supp. 1098 (S.D.N.Y. 1973), *aff'd*, 505 F.2d 989 (2d Cir. 1974) ...............14

*Schneider Nat'l Transport v. Ford Motor Co.*,
   280 F.3d 532 (5th Cir. 2002) ........................................................................13, 19

*Spriggs v. Diamond Auto Glass*,
   242 F.3d 179 (4th Cir. 2001) ..................................................................................4

*Thompson v. Potomac Elec. Power Co.*,
   312 F.3d 645 (4th Cir. 2002) ..................................................................................4

*Tokio Marine & Fire Ins. Co. v. Ins. Co. of N. Am., Inc.*,
   262 A.D.2d 103 (N.Y. App. Div. 1999) ................................................................6

*Walker v. Erie Ins. Co.*,
   210 A.D.3d 1375 (N.Y. App. Div. 2022) ......................................................10, 17

*Zurich Ins. Co. v. Heil Co.*,
   815 F.2d 1122 (7th Cir. 1987) ..........................................................................13, 18

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ..................................................................4

COUCH ON INSURANCE (3d. 2023) ................................................................................8

THE UMBRELLA BOOK (Gary W. Griffin et al. eds., December 2000) ....................10, 11

## INTRODUCTION

Instead of standing with their insured, Tyco Fire Products LP ("Tyco"), in its present time of need, the AIG Insurers[1] have refused, now for more than seven years, to honor *any* of their coverage commitments, under *any* of the scores of insurance policies that they have sold to Tyco over the years, on the basis of a variety of meritless defenses. One such defense is that any amounts Tyco may pay in connection with the thousands of underlying complaints at issue relating to the use of Aqueous Film-Forming Foams (the "AFFF Claims") will *likely not exceed many self-insured retentions or deductibles*, such that Tyco's losses will never reach the hundreds of millions of dollars in coverage provided by various AIG umbrella policies.

Thus, according to the AIG Insurers, they may owe Tyco *nothing at all* under many AIG policies, even if Tyco faces hundreds of millions of dollars in liability and defense costs and despite Tyco having paid more than $100 million to AIG in premiums for the primary and umbrella policies at issues in this Motion. *See* Declaration of Alexis N. Dyschkant ("Dyschkant Decl.") at ¶ 2. And these are not excess liability policies. AIG—far and away Tyco's largest insurer—sold Tyco *primary and umbrella* coverage for more than 20 years at issue, meaning that when Tyco faces significant claims of liability within these years, the AIG Insurers are supposed to be Tyco's first-line partner in defense.

AIG's position is not correct (or reasonable) under the policy language at issue. Tyco thus respectfully moves for partial summary judgment on the proper interpretation of the deductibles, self-insured retentions, and retained limits in certain AIG primary and umbrella insurance policies. Specifically, for the reasons set forth below, Tyco seeks a partial summary judgment, declaring

---

[1] For purposes of this Motion, the "AIG Insurers" are Defendants National Union Fire Insurance Company of Pittsburgh, Pa., American Home Assurance Company, and New Hampshire Insurance Company.

that: (1) deductible payments by Tyco erode the applicable limits of liability under the Primary Policies that are subject to deductibles, thereby reducing (by the amount of the deductible) the point at which overlying umbrella policies are reached; (2) Pollution Exclusion Endorsement Self-Insured Retentions ("SIRs") in the post-1999 Umbrella Policies do not apply to the AFFF Claims; and (3) the Retained Limit Amendatory Endorsement in certain Umbrella Policies, where applicable, can be satisfied by underlying or other insurance. Judgment regarding these issues will materially advance the resolution of this matter by confirming the conditions under which the AIG Insurers' policy limits are available to pay for covered claims.

## BACKGROUND

The AIG Insurers issued primary and umbrella general liability insurance policies to Tyco relevant to this Motion for more than 23 years, from June 1, 1990 through October 1, 2013 (collectively, the "AIG Policies"). Dyschkant Decl. at ¶ 2. The AIG Policies consist of primary comprehensive general liability policies (the "Primary Policies") and umbrella liability policies (the "Umbrella Policies"). The Primary and Umbrella Policies provide Tyco's first line of defense against product liability claims for alleged bodily injury and property damage during the years covered by these Policies. Collectively, these AIG Policies afford product liability limits of more than $700 million.[2] Examples of the Primary Policies are attached as Exhibits 3 and 4, and copies of the Umbrella Policies that are the subject of this Motion are attached as Exhibits 7 through 15.

Tyco continues to incur significant defense costs, and faces the risk of potentially substantial losses, arising from the thousands of AFFF Claims asserted against it. The AFFF

---

[2] The AIG Insurers and other AIG affiliates issued additional general liability policies to Tyco and its predecessors, including numerous excess policies. The combined aggregate limits of these additional policies and the AIG Policies relevant to this Motion exceed $3 billion. To date, AIG has not paid Tyco a cent, for either defense coverage or indemnity coverage under these policies.

Claims have largely been consolidated in a multi-district litigation pending in this Court and captioned *In re Aqueous Film-Forming Foams Products Liability Litigation*, No. 2:18-mn-02873 (the "MDL"). The AFFF plaintiffs generally allege that AFFF contains or breaks down into PFAS compounds and that use of AFFF has caused property damage and/or bodily injury.

The plain language of the AIG Policies supports Tyco's position on each of the three issues on which Tyco hereby moves:

*First*, certain of the Primary Policies issued to Tyco by the AIG Insurers include deductible provisions requiring Tyco to reimburse the primary insurer, up to a deductible limit, for covered amounts paid as damages and, in some instances, for additional sums. As explained in Section I, *infra*, the plain language of these Policies states that payments within the deductible (consistent with the ordinary meaning of a deductible in an insurance policy) are not "in addition to"—but rather are part of—the Primary Policy limits, and thus, amounts paid by Tyco within the deductible *erode* the Primary Policy limits and contribute to the exhaustion of such limits—i.e., the point at which umbrella and excess policy limits are reached. AIG's corporate designee on underwriting issues in this action has confirmed this interpretation. *See infra* Section I.

*Second*, certain Umbrella Policies incepting on or after July 1, 1999, contain a "Named Peril and Time Element Pollution Endorsement" ("Pollution Exclusion Endorsement") that includes a self-insured retention ("SIR"). As explained in Section II, *infra*, this SIR does not apply here because, by its terms: (a) this SIR applies *only* when coverage for a claim is "granted" by the Pollution Exclusion Endorsement, which is not the case for AFFF Claims; (b) there is no Umbrella Policy SIR when, as here, the Umbrella Policies promise to pay on a claim immediately after exhaustion of the primary coverage; and (c) in some of the Policies at issue, this SIR states that it does not apply to a claim covered by the underlying insurance, and the AFFF claims are so covered.

*Third*, certain of the Umbrella Policies incepting on or after October 1, 2001 also contain a "Retained Limit Amendatory Endorsement" ("Retained Limit Endorsement") that, under certain circumstances not applicable here, stipulates an attachment point or "Retained Limit" over which the Umbrella Policy's coverage will attach.  As explained in Section III, *infra*, such Retained Limits do not apply to AFFF Claims because: (a) for two of the Umbrella Policies, AIG did not issue the endorsement in a manner to apply the Retained Limit; and (b) Tyco has already incurred tens of millions of dollars to satisfy the primary deductibles in certain Primary Polices (and will incur tens of millions more to satisfy the remaining primary deductibles), and is not required to satisfy a *second* deductible/retention (of exactly the same amount) prior to accessing the *umbrella* coverage afforded by the Umbrella Policies.

## LEGAL STANDARD

Summary judgment is appropriate where admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (citation and quotations omitted).  A dispute concerning a material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citation and quotations omitted).  Once a prima facie showing has been made, the non-moving party can avoid summary judgment only by demonstrating that specific, material facts exist that give rise to a genuine issue.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-moving party's] case."  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Summary judgment is often appropriate in insurance coverage cases because the interpretation of insurance policy language presents questions of law.  *See Cont'l Cas. Co. v. Amerisure Ins. Co.*, 886 F.3d 366, 370 (4th Cir. 2018).  Further, this Motion presents no choice-of-law issue because there is no potential conflict of law here.  The law of any potentially applicable jurisdiction will enforce the policy language as written and will construe the standard-form exclusionary language at issue narrowly, and strictly against the insurer, resolving any reasonable ambiguities in favor of coverage.  *See, e.g., Donaldson v. Urban Land Interests, Inc.*, 564 N.W.2d 728, 731 (Wis. 1997) ("[A]mbiguities in a policy's terms are to be resolved in favor of coverage, while coverage exclusion clauses are narrowly construed against the insurer."); *Greenville Cty. v. Ins. Reserve Fund*, 443 S.E.2d 552, 553 (S.C. 1994) (similar).

## ARGUMENT

The extent to which deductibles apply under the Primary Policies, and whether SIRs or Retained Limits apply under the Umbrella Policies, are important issues in determining the amount of coverage that the AIG Insurers owe to Tyco for AFFF Claims, or—as AIG would have it—whether AIG will pay anything at all under certain of its Policies.  For the reasons set out below, Tyco seeks partial summary judgment that (1) deductible payments by Tyco erode the applicable limits of liability of the relevant Primary Policies; (2) Pollution Exclusion Endorsement SIRs in certain post-1999 Umbrella Policies do not apply to the AFFF Claims; and (3) the Retained Limit in certain Umbrella Policies, where applicable, can be satisfied by underlying or other insurance.

## I.    Amounts Paid Under Primary Policy Deductibles Erode Primary Policy Limits.

A deductible under an insurance policy is "the portion of the loss to be borne by the insured before the insurer becomes liable for payment."  BLACK'S LAW DICTIONARY (11th ed. 2019) (definition of "deductible") (attached as Ex. 1 to Dyschkant Decl.).  Many of the Primary Policies include deductible provisions which, where applicable, range from $500,000 to $7.5 million.

Through this Motion, Tyco seeks a limited and focused ruling that any deductible payments made by Tyco for AFFF Claims reduce the applicable limits of liability of the Primary Policies that are the subject of this Motion.  Such a ruling is supported by the relevant policy language, the testimony of AIG in this action, AIG's interpretation of such policy language in other cases (where its interests were served by a correct interpretation), and settled and familiar insurance principles.

The general rule is that, absent policy language to the contrary, deductible payments reduce (i.e., erode) policy limits.  Thus, a policy with a $10 million limit and a $1 million deductible provides $9 million in coverage above (and after deducting) the insured's initial $1 million payment of loss.  *See, e.g.*, *Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1021 (7th Cir. 2020) ("a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance") (quoting *In re Sept. 11th Liab. Ins. Coverage Cases*, 333 F. Supp. 2d 111, 124 n.7 (S.D.N.Y. 2004)); *Tokio Marine & Fire Ins. Co. v. Ins. Co. of N. Am., Inc.*, 262 A.D.2d 103, 103 (N.Y. App. Div. 1999) ("true deductible [is] properly subtracted from the policy limits"); *IMO Indus., Inc. v. Transamerica Corp.*, 101 A.3d 1085, 1110–11 (N.J. Super. Ct. App. Div. 2014) ("New Jersey courts have recognized that an insured's deductible erodes the policy limits."); *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 495 (Ind. Ct. App. 2004) ("a deductible is subtracted from a policy's limits, thereby reducing an insurer's total obligation to the insured").  AIG has recognized and even advocated for this approach in prior coverage litigation, where it stated for example: "[A]bsent policy language to the contrary, deductibles erode policy limits . . . ."  Brief of Plaintiffs-Appellants at 21, *Lexington Ins. Co. v. RLI Ins. Co.*, No. 19-1426, ECF No. 15 (7th Cir.) (attached as Ex. 2 to Dyschkant Decl.).

The AIG Primary Policies with deductibles are consistent with this familiar and well-understood approach.  Many of the Primary Policies incepting during or after 2000 include a

"Deductible Coverage Endorsement" that states, as the first of several "Payment and Deductible Conditions:"

> We will pay all sums that we become obligated to pay up to our Limit of Insurance under the policy to which this endorsement applies. Our Limit of Insurance *includes*, and *shall not apply in addition to*, any sum that you must reimburse us for damages, benefits or Medical Payments we have paid.

*See, e.g.*, Dyschkant Decl., Ex. 3 (Primary Policy No. GL 480-59-49 (10/01/03–10/01/04)), Deductible Coverage End., at 1 (emphasis added).  It then adds: "You must reimburse us up to the Deductible Limit(s) shown in the Schedule for any amounts we have so paid as damages, benefits or Medical Payments."  *Id.*  This language makes clear that the Primary Policies here function in the normal way, that is, the Primary Policy limits of liability—*i.e.*, "Our Limit of Insurance"— "include[], and shall not apply in addition to" sums that Tyco reimburses within the deductible. *Id.*  Stated differently, amounts that Tyco pays or absorbs to satisfy the deductible are not "in addition to" but rather, are part of, the limits of the Primary Policies.  This is consistent with the standard meaning and treatment of a deductible, as summarized above.[3]  AIG's corporate designee has conceded in this case that Tyco's deductible erodes the limits of its coverage.  *See* Dyschkant Decl., Ex. 5 (Seibold Dep. Tr.) at 149:10–151:3.  A policy with a $10 million limit and a $1 million

---

[3] Further, certain Primary Policies may not contain a deductible at all.  For example, the Deductible Liability Insurance endorsement in the 1997 Primary Policy includes a deductible "Schedule" stating that AIG's obligation "to pay damages on your behalf applies only to the amount of damages in excess of any deductible amount stated in the Schedule above as applicable to such coverages."  *See* Dyschkant Decl., Ex. 4 (Primary Policy No. RMGL 143-85-92 (7/1/97–7/1/98)), Deductible Liab. Ins. End., at 1.  That Schedule is blank.  *Id.*  AIG's corporate designee on the underwriting of AIG's Primary Policies conceded at his deposition that the information required for this deductible endorsement to be effective is missing from the policy.  *See* Dyschkant Decl., Ex. 5 (Seibold Dep. Tr.) at 132:5–8 (Q: "Is the information required to complete the deductible liability insurance endorsement shown on this declarations page?"  A: "It's not.").  Tyco reserves all of its rights with respect to which of the AIG Primary Policies have specified, and therefore potentially applicable, deductibles.

7

deductible is thus exhausted, leading to access of overlying insurance, after payment of $10 million (*including* the $1 million deductible paid by the insured), *not* after payment of $11 million (i.e., the $10 million limit *plus* the $1 million deductible).

The foregoing is also consistent with how AIG has interpreted similar deductible language in its policies issued to other policyholders.  For example, in a coverage dispute with its policyholder Yahoo!, AIG argued, under a Deductible Coverage Endorsement with the same wording as that quoted above, that the liability limits of general liability policies were reduced by amounts paid by the policyholder.  *See* Appellee's Brief and Cross-Appellant's Opening Brief at 9–10, *Yahoo! Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. 19-16475, ECF No. 24 (9th Cir.) (attached as Ex. 6 to Dyschkant Decl.); *see also Northland Ins. Co. v. Am. Home Assurance Co.*, 689 S.E.2d 87, 88 (Ga. Ct. App. 2009) ($5 million deductible under same "Deductible Coverage Endorsement" treated as within, rather than in addition to, limits of $10 million AIG policy).

Tyco is thus entitled to a ruling that payments within the deductible erode the Primary Policy limits.

## II.    Pollution Exclusion Endorsement SIRs in the Post-1999 Umbrella Policies Do Not Apply.

Certain Umbrella Policies incepting on or after July 1, 1999 contain a Pollution Exclusion Endorsement that includes a SIR which applies only under certain circumstances not presented by the AFFF Claims.  The SIR in each Pollution Exclusion Endorsement ranges in amount from $2 million to $7.5 million, depending on the policy period.  This SIR does not apply to the AFFF Claims for three independent reasons, and one of which would be sufficient to support a holding that these SIRs don't apply in the AFFF claims.  <u>First</u>, the Pollution Exclusion Endorsements do not "grant" any relevant coverage here, as is required for their SIRs even potentially to apply.

*Second*, the AIG Insurers agreed that their Umbrella Policies would "continue in force as underlying insurance" upon exhaustion of such underlying Primary Policies—without any imposition of a second deductible or retention.  Here, the AFFF Claims readily exhaust the underlying primary insurance, and Tyco has already paid tens of million to satisfy the deductibles in those Primary Policies; thus the AIG Umbrella Policies attach without any further retention.

*Third*, the 1999–2003 Pollution Exclusion Endorsements state that their SIRs do not apply where, as here, the AFFF Claims are covered by underlying insurance.  For all these reasons, the SIRs in the Umbrella Policies do not apply to the AFFF Claims.

### A.    The SIRs in the Umbrella Policy Pollution Exclusion Endorsement SIRs Do Not Apply Because Those Endorsements Do Not "Grant" the Product Liability Coverage at Issue Here.

The scope of the Pollution Exclusion Endorsement SIRs is very narrow.  Under the four (4) Umbrella Policies covering the 1999–2003 period, this Pollution Exclusion Endorsement SIR applies "solely as respects any coverage granted by this endorsement, . . . to any occurrence which is covered by this policy but not covered by the underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured due to an exclusion(s) contained therein."  *See, e.g.*, Dyschkant Decl., Ex. 9 (Umbrella Policy No. BE 8713678 (10/1/01–10/1/02)), at End. No. 3, at 3.  Similarly, under the 2003–2008 Umbrella Policies, this SIR applies only to pollutant-related damages "covered under this endorsement." (The 2003–2008 Pollution Exclusion Endorsements add that their SIR can in any event be satisfied by underlying "or other insurance providing coverage to the Insured applicable to a loss.")  *See, e.g.*, *id.*, Ex. 11 (Umbrella Policy No. BE 2977855 (10/1/03–10/1/04)) at End. No. 9, at 2.  Thus, by their plain terms these SIRs apply only to coverage "granted" by the Pollution Exclusion

Endorsements (1999–2003) or to pollutant-related damages "covered" by the Pollution Exclusion Endorsements (2003–2008).

It is a basic tenet of liability insurance that exclusions do not "grant" coverage or provide coverage; rather, they exclude or limit coverage: "An exception to an exclusion narrows the application of the exclusion; the exception does not grant coverage beyond that provided in the insuring clauses." Restatement of the Law of Liability Insurance, Sect, 32 (5) (2019); *see also* 9A COUCH ON INSURANCE § 129:1 (3d. 2023) ("exclusions . . . remove coverage for risks that would otherwise fall within the purview of the insuring clauses"); *Harbor Ct. Assocs. v. Kiewit Const. Co.*, 6 F. Supp. 2d 449, 458 n.21 (D. Md. 1998) ("It is fundamental that 'exclusion clauses do not grant coverage; exclusions limit the scope of coverage granted in the insuring agreement.'") (citation omitted); *K & L Homes, Inc. v. Am. Family Mut. Ins. Co.*, 829 N.W.2d 724, 728 (N.D. 2013) (citation omitted) ("[A]n exception [to an exclusion] may become applicable if, and only if, there is an initial grant of coverage under the policy and the relevant exclusion containing the exception operates to preclude coverage.").

It is unclear what if any claims might qualify for coverage "solely . . . granted" by this Endorsement. At best for AIG, their underwriters failed to draft an exclusionary endorsement in the "clear" and "unmistakable" language necessary for it to be enforced against Tyco. *See, e.g.*, 17A COUCH, *supra*, § 254:12 ("the insurer bears the burden of proving the applicability of policy exclusions and limitation"); *Auto Owners Ins. Co. v. Benjamin*, 781 S.E.2d 137, 144 (S.C. Ct. App. 2015) ("Insurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability."); *Walker v. Erie Ins. Co.*, 210 A.D.3d 1375, 1377 (N.Y. App. Div. 2022) (insurer bears "'heavy burden' of establishing that the exclusion is expressed in clear and unmistakable language"); *Day v. Allstate Indem. Co.*,

798 N.W.2d 199, 206 (Wis. 2011) (a court may only "enforce exclusions that are clear from the face of the policy").

For this reason alone, the SIR in this exclusion cannot be enforced.  But even if it could, the Pollution Exclusion Endorsement SIRs are intended, by their terms, to apply *only* if coverage is granted in the first instance by the terms of the Pollution Exclusion Endorsement's exclusion and *not* by the relevant Primary Policy or the policy form of the Umbrella Policy—which contains the actual "Insuring Agreements" on which Tyco relies that grant the relevant product liability coverage.  Because Tyco is not relying on Pollution Endorsements as affirmative grants of coverage, the SIRs, by their own terms, do not apply, and AIG cannot re-write this language now in an effort to make it applicable or comprehensible.  To the contrary, coverage for AFFF Claims is squarely *granted* by the insuring agreements in the Primary and Umbrella Policies, which grant coverage for precisely the types of claims at issue here: product liability for third-party bodily injury or property damage claims asserted against Tyco.  *See, e.g.*, Dyschkant Decl., Ex. 9 (Umbrella Policy No. BE 8713678 (10/1/01–10/1/02)), at Insuring Agreements, Section I, Coverage.

## B.    The Umbrella Policies' Structure and Language Support This Result.

The inapplicability of the SIRs in the Pollution Exclusion Endorsement is further supported by the nature, wording, and structure of the Umbrella Policies, and by the typical manner in which such policies operate.  Policyholders such as Tyco purchase umbrella liability policies for two reasons: first, to cover risks where primary insurance proves uncollectible or unavailable due to insurer insolvencies or for other reasons (in which case an "umbrella" policy, as its name implies, may step in and an umbrella retention, therefore, often applies), and second, to provide protection from larger exposures that are covered by, but exceed, the amounts available from primary insurance.  The first reason is inapplicable here given that the AFFF Claims are covered by the

11

Primary Policies.  As to the second, as a leading treatise on umbrella policies explains:  "For most entities, the umbrella policy is the most important component in the organization's insurance portfolio.  Umbrellas provide at least part of the high limits needed for catastrophic loss protection and in many instances, the umbrella is broader than underlying liability insurance."  THE UMBRELLA BOOK, Introduction 12 (Gary W. Griffin et al. eds., December 2000) (attached as Ex. 16 to Dyschkant Decl.).

Among the "principal functions" served by umbrella policies are their "[d]rop-down feature" (as is well-known in insurance circles): "When underlying aggregate policy limits are reduced or exhausted through the payment of loss, or where there is no underlying coverage, the umbrella should 'drop down' to become the primary insurance for defense, indemnity and related expense."  *Id*.  This "important function of umbrella liability insurance is to provide replacement coverage for exhausted underlying insurance.  If underlying coverage limits are reduced or exhausted, umbrella coverage should be activated. . . . Many umbrella policy forms contain a provision stating that coverage will drop down to replace reduced or exhausted underlying coverage limits."  *Id*. at Policy Terms § LLdd-1 (Nov. 2003).

Each of the Umbrella Policies issued here by AIG includes a standard umbrella policy "drop down" provision stating that, where the underlying insurance and/or Retained Limit is exhausted or otherwise unavailable, "we will . . . continue in force as underlying insurance."  *See, e.g.*, Dyschkant Decl., Ex. 7 (Umbrella Policy No. BE 7016213 (7/1/99–7/1/00)), at Insuring Agreements, Section III, Limits of Insurance, at III.D.2.  Courts considering this language have repeatedly affirmed that this standard umbrella policy provision is intended (as AIG surely knows) to ensure a seamless transition to umbrella coverage—without the imposition of a new retention— once underlying primary coverage exhausts. *See, e.g.*, *Housing Grp. v. Cal. Ins. Guarantee Ass'n*,

47 Cal. App. 4th 528, 535 (Cal. Ct. App. 1996) (exclusion found in umbrella policy did not apply where primary policy covered claim and umbrella policy promised to "continue in force as underlying insurance" upon primary exhaustion). Based on this language, where underlying primary coverage is exhausted, AIG must afford coverage under its Umbrella Policies *on the same terms* as the Primary Policies. *See also Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1126 (7th Cir. 1987) ("Several courts have interpreted policies that provide" that they will "continue in force as underlying insurance . . . . These courts have held that the policy means exactly what it says—the excess insurer functions as the primary insurer only when the exhaustion occurs by reason of losses paid under the policy."); *Schneider Nat'l Transport v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002) ("The plain and ordinary meaning of these policy provisions is that when underlying insurance has become exhausted, that is, when the company providing underlying insurance has paid on one or more claims to the maximum required under that policy, this insurance, the excess coverage, will come into play.").

AIG does not have the contractual right to *a second retention or deductible*, *identical to the first*, at the umbrella level. To be sure, for different claims (those *not* covered by the Primary Policies but covered by the Umbrella Policies), the retention in the Umbrella Policies could apply, but that is not the situation presented by the AFFF Claims.

AIG may contend that, although it agreed for its Umbrella Policies to "continue in force as underlying insurance" upon exhaustion of the Primary Policies, what it really meant to say was that it would do so subject to different, additional, or contrary deductible and other terms in its Umbrella Policies or their endorsements. But if that was AIG's intent, standard policy language was readily available modifying its unqualified, plain-vanilla "drop down upon primary exhaustion" language, to state that the umbrella would *not* "continue in force as underlying"

13

insurance" upon primary exhaustion, or that it would do so but only "*subject to its [this policy's] Insuring Agreements, Definitions, Exclusions, Conditions and other terms*."  THE UMBRELLA BOOK, *supra*, at Policy Terms § LLdd-1 (emphasis added).

AIG, however, did not qualify its "drop-down upon primary exhaustion" language in either of these ways, or any other relevant way—presumably because doing so would have made its offering much less competitive and attractive to customers in the umbrella market—and it cannot now interpret or apply its Umbrella Policies (with Tyco's premiums in hand) as if they contained this different insuring language.  *See, e.g., Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 368 F. Supp. 1098, 1118 (S.D.N.Y. 1973), *aff'd*, 505 F.2d 989 (2d Cir. 1974) ("Where the risk is well known and there are terms reasonably apt and precise to describe it, the use of substantially less certain phraseology . . . is likely to result in interpretations favoring coverage rather than exclusion."); *McMillin Mgmt. Servs., L.P. v. Fin. Pac. Ins. Co.*, 17 Cal. App. 5th 187, 206 (2017) ("[T]he insurers' failure to use available language expressly excluding completed operations coverage implies a manifested intent not to do so."); *Gerdau Ameristeel US Inc. v. Zurich Am. Ins. Co.*, 2021 WL 7691816, at *1 (S.D. Fla. July 26, 2021) ("[I]f different language was available that would have accomplished the insurer's present objective, the failure to use that language is proof of the insurer's intent not to restrict coverage.").

In short, as AIG well knows, when the underlying primary policy covers a claim—as is the case with the AFFF Claims—the umbrella policy attaches as excess coverage upon exhaustion of the underlying policy.  The Pollution Exclusion Endorsement SIRs in AIG's Umbrella Policies do not apply to the AFFF Claims here because Tyco *already is paying* the applicable deductible or retention under the Primary Policies and looking to the Umbrella Policies for their promised excess coverage, which is *not* subject to a second deductible or retention.

14

**C.    The SIRs in the Umbrella Policy Pollution Exclusion Endorsement SIRs Do Not Apply Because the AFFF Claims Are Covered by Underlying Insurance.**

Even if the Court were to hold that (a) Tyco's coverage under the Umbrella Policies is "granted" by the Pollution Exclusion Endorsements and thus, the SIRs therein apply against Tyco, *see* Section II.A, *supra*, and (b) those SIRs are triggered despite the fact that Umbrella Policies "continue in force as underlying insurance" *see* Section II.B, *supra*, the SIRs in the Pollution Exclusion Endorsements of at least four of the Umbrella Policies do not apply the AFFF Claims *by their own terms*.

Specifically, the Pollution Endorsements in the Umbrella Policies in effect between 1999 and 2003 were expressly written to apply *only* where coverage is not available in that year's underlying Primary Policy.  These Endorsements state:

> It is further agreed that solely as respects any coverage granted by this endorsement, the following shall apply to any occurrence *which is covered by this policy but not covered by the underlying policies* listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured due to an exclusion(s) contained therein: [a $5 million SIR].

*E.g.,* Dyschkant Decl., Ex. 9 (Umbrella Policy No. BE 8713678 (10/1/01–10/1/02)), at End. No. 3, at 3 (emphasis added).[4]  To the extent Tyco's coverage for AFFF Claims is "covered by the underlying policies" (and it is), these SIRs are expressly inapplicable.

---

[4] The 1999–2000 Umbrella Policy contains only the first clause of this paragraph ("It is further agreed that solely as respects any coverage granted by this endorsement") before setting forth the $2 million SIR.  Dyschkant Decl., Ex. 7 (Umbrella Policy No. BE 7016213 (7/1/99–7/1/00)), at End. No. 2 (Revised), at 2.  To the extent that the Court finds that the Pollution Exclusion "grants" coverage at all, *see* Section II.A, *supra*, the most reasonable reading of that language is that the Pollution Exclusion Endorsement SIR applies on the same basis that the exclusions in the 2000–2003 Umbrella Policies apply—i.e., when coverage is "granted" by the Pollution Exclusion Endorsement because the underlying Primary Policy does not itself provide coverage.

Contemporaneously with filing this Motion, Tyco has moved for partial summary judgment on the ground that certain pollution exclusions in certain primary policies issued by the AIG Insurers do not bar coverage for the AFFF Claims, including the Primary Policies for the 1999–2003 years. Tyco incorporates by reference its arguments as to those Primary Policies, as if fully set forth in this Motion. A finding in Tyco's favor on that issue would be dispositive for the ruling Tyco seeks on this issue as well. Because the AFFF Claims are not excluded by the pollution exclusions in the Primary Policies for the 1999–2003 years, the Pollution Exclusion SIRs in the 1999–2003 Umbrella Policies do not apply as a matter of law.

*     *     *     *

For all of the reasons explained above, Tyco is entitled to a holding that the SIRs in the Umbrella Policies do not apply to the AFFF claims.

## III. Umbrella Policy Retained Limits Do Not Apply in Certain Policy Periods and, in Any Event, Can Be Satisfied by Underlying or Other Insurance.

The 2001–2008 Umbrella Policies include Retained Limit Endorsements that, under certain circumstances and under certain of the Umbrella Policies, stipulate an attachment point (or "Retained Limit") over which the Umbrella Policy's coverage will attach. The "Retained Limit" is not specified in the 2001 and 2002 Umbrella Policies, but the relevant "Retained Limit" is $5 million under the 2003 Umbrella Policy, and increases to $7.5 million under the 2004 to 2008 Umbrella Policies. For the reasons explained below, the unspecified Retained Limits in the 2001 and 2002 Umbrella Policies render the endorsements ineffective for those policies, and the Retained Limits for the 2003–2008 Policies may be satisfied by underlying or other insurance.

A.    **The Retained Limits in the 2001 and 2002 Umbrella Policies Do Not Apply Because AIG Did Not Specify Such Limits in These Policies.**

In addition to the SIR provision contained in the Pollution Exclusion Endorsements, the 2001 and 2002 Umbrella Policies contain *separate* Retained Limit Endorsements that refer to Retained Limits ostensibly "stated in the Schedule of Retained Limits attached to this policy" and "shown in the attached Schedule."  Dyschkant Decl., Ex. 9 (Umbrella Policy No. BE 8713678 (10/1/01–10/1/02)), End. No. 9, at 1; *id.*, Ex. 10 (Umbrella Policy No. BE 2195412 (10/1/02– 10/1/03)), End. No. 6, at 1.  However, no such Schedule of Retained Limits appears attached to either of these two Umbrella Policies.  The amount of any potential Retained Limit is thus not specified or stipulated in either Policy.  Under these circumstances, the Retained Limit Endorsement in the 2001 and 2002 Policies is of no force or effect.

It was AIG's burden to set forth in clear and unmistakable language the limitations it sought to include in its insurance policy, and even assuming AIG intended to specify a Retained Limit in these policies, AIG failed to meet that burden here.  *See, e.g.*, 17A Couch, *supra*, § 254:12 ("the insurer bears the burden of proving the applicability of policy exclusions and limitations"); *Auto-Owners Ins. Co. v. Cincinnati Ins. Co.*, 395 F. Supp. 3d 686, 691 (D.S.C. 2019) (insurer "bears the burden of establishing the exclusion's applicability"); *Auto Owners*, 781 S.E.2d at 144; *Walker*, 210 A.D.3d at 1377; *Day*, 798 N.W.2d at 206.  The AIG Insurers cannot impose against Tyco a purported retained limit, in any amount, that they did not include in the policies.

B.    **Retained Limits Can Be Satisfied by Underlying Insurance or Other Insurance, Which Affords Coverage Here.**

In contrast to what one sees in the 2001 and 2002 Umbrella Policies (as just discussed), the Retained Limit Endorsements in the 2003–2008 Umbrella Policies include a Schedule of Retained

Limits.  Those Endorsements, however, make clear that the Retained Limit can be satisfied by underlying or other insurance.  They state, for example:

> Amounts received through such policies listed in the Schedule of Underlying Insurance or other insurance providing coverage to the Insured for payment of the loss may be applied to reduce or exhaust the Retained Limit if such policies were purchased by the Named Insured to specifically apply as underlying insurance to this policy.

Dyschkant Decl., Ex. 11 (Umbrella Policy No. BE 2977855 (10/1/03–10/1/04)), End. No. 14, at 2.[5]  Under this provision, the Retained Limit can be satisfied through at least two sources.  The first is underlying policies.  The second is "other insurance providing coverage to the Insured for payment of the loss."  *Id.*  The underlying AIG Primary Policies afford coverage for the AFFF Claims, for reasons set forth in detail above and in Tyco's accompanying motion for summary judgment on those Primary Policies' pollution exclusions.  Given this fact, the relevant Retained Limit—whether $5 million or $7.5 million—can be funded by "[a]mounts received" from the underlying AIG Primary Policies, whose applicable limits of liability typically mirror the Retained Limit.[6]

In other words, the effect of ruling in Tyco's favor on this issue of contract interpretation would be the common-sense result that—for example, after a primary policy pays its $5 million in limits on a covered claim—the Umbrella Policy takes over payment for the next dollar—that is, at $5,000,001.  This is the normal "hand and glove" manner in which primary and umbrellas work seamlessly together.  *See, e.g.*, *Housing Grp.*, 47 Cal. App. 4th at 535; *Zurich Ins.*, 815 F.2d at

---

[5] Materially identical language appears in the 2004–2008 Umbrella Policies.

[6] Because the AIG Primary Policies underlying the AIG Umbrella Policies afford coverage for the AFFF Claims, Tyco need not address here the extent to which other insurance—i.e., "other insurance providing coverage to the Insured for payment of the loss"—could likewise satisfy the Retained Limits.  Tyco reserves all of its rights with respect to this issue.

1126; *Schneider Nat'l Transport*, 280 F.3d at 538.  A finding to the contrary would leave an unexplained and unintended gap in coverage between $5,000,001 and $10 million, which is not supported by the policy language or the reasonable expectations of a policyholder.  There is a good reason why the Primary Policy limits and Umbrella Policy Retained Limits match: it ensures consistent coverage as the limits of liability transition from primary to excess coverage (or it ensures that the retained limit in the umbrella applies, in the same amount as the primary, for claims that—unlike AFFF claims—are not covered in the primary).  This result complies with both the plain policy language here and the well-understood manner in which umbrella polices work.

In contrast to this sensible and standard interpretation of umbrella coverage, AIG's approach—which would first require exhaustion of the large primary deductibles, and then apply a second large retention, in the exact same amount, prior to attachment of the Umbrella Policies— violates both the plain policy language and the common understanding of how primary and umbrella policies work together.  An umbrella retention makes perfect sense to protect the insurer where the claim is covered by the umbrella but not covered by the primary—in such case the primary deductible has not been satisfied, and the umbrella retention applies in its place.  But here Tyco has already incurred tens of millions of dollars to satisfy the primary deductible in certain Primary Polices (and will incur tens of millions more to satisfy the remaining primary deductibles). Having done so, nothing in the relevant policies requires Tyco to satisfy a second deductible or retention prior to accessing the umbrella coverage.

For all the reasons set forth above, Tyco is entitled to an order holding that once it has satisfied the primary deductible and exhausted the Primary Polices, the SIR and Retained Limits in the Umbrella Policies do not apply to AFFF claims.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Tyco's Motion for Partial Summary Judgment against the AIG Insurers and hold that:

1. Deductible payments made by Tyco reduce the applicable limits of liability of the Primary Policies which contain deductibles;

2. The SIR provision included in the Pollution Exclusion Endorsements of the Umbrella Policies do not apply to the AFFF Claims;

3. The Retained Limit Amendment Endorsements in the 2001 and 2002 Umbrella Policies do not contain a Schedule of Retained Limits and therefore have no force or effect; and

4. The Retained Limit Amendatory Endorsements in the 2003-2008 Umbrella Policies can be satisfied by underlying or other insurance.

Dated: March 18, 2024

WILLS MASSALON & ALLEN LLC

By: */s/ Christy Ford Allen*
Christy Ford Allen (SC Bar 07549)
Post Office Box 859
Charleston, South Carolina 29402
Tel:     (843) 727-1144
Email: callen@wmalawfirm.net

and

COVINGTON & BURLING LLP

Allan B. Moore (admitted *pro hac vice*)
Timothy D. Greszler (admitted *pro hac vice*)
Alexis N. Dyschkant (admitted *pro hac vice*)
850 Tenth Street, NW
Washington, DC 20001
Tel:     (202) 662-5575
Email: abmoore@cov.com

*Counsel for Tyco Fire Products LP*

21