IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
CASE NUMBER: 2:23-CV-02384-RMG

| | |
|---|---|
| **TYCO FIRE PRODUCTS LP,**<br><br>Plaintiff,<br><br>v.<br><br>**AIU INSURANCE COMPANY, et al.**<br><br>Defendants. | **TIG INSURANCE COMPANY'S RESPONSE IN OPPOSITION TO TYCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING POLLUTION EXCLUSIONS [ECF NO. 256]** |

TIG Insurance Company ("TIG"), by and through its undersigned counsel, submits this Response in Opposition to Plaintiff's Motion for Partial Summary Judgment Regarding Certain Pollution Exclusions. [ECF No. 265].

## SUMMARY

Tyco has been named in thousands of lawsuits alleging that chemicals in its aqueous film forming foam ("AFFF") have contaminated water sources, soil, and groundwater, resulting in injury to persons and property. As this Court knows, the volume of suits led to the creation of a multi-district litigation ("MDL"), which has prioritized suits by public water providers who allege chemicals contained in or degraded from AFFF have contaminated their water sources, necessitating clean up.

Tyco seeks coverage from TIG and other insurers in connection with those suits. TIG issued a high-level excess umbrella policy from July 1, 1997 to July 1, 1998, with limits of $30 million excess of $90 million underlying limits which, in turn, is excess to underlying primary policies. (Ex. A, TIG Policy). TIG has no duty to defend any suit. (*Id.* at p. 1) ("███████████ ██████████████████████████████████████████████████████████████████ ████████████"). Thus, the only question as to TIG's coverage focuses on indemnity. TIG's

policy comes into play only "███████████████████████████████████████████████
███████████████████████████████████████████████████████████" of the
underlying policies. That has not happened yet. Therefore, the TIG Policy has not been triggered, and rulings as to the TIG Policy Pollution Exclusion are unripe.

Even if questions regarding the TIG Policy were ripe, the TIG Policy includes a broad pollution exclusion. The application of the pollution exclusion to the water provider claims – the only ones for which bellwether discovery has been performed – is unavoidable. Rather than face this issue head-on, Tyco tries to merge all AFFF suits into an amorphous "product liability" claim, and then argues that the pollution exclusion somehow does not apply to "product liability" claims.

The AFFF suits vary wildly in type, and they cannot be mixed into a single bucket for purposes of evaluating a pollution exclusion. This Court in the MDL has made this clear, identifying the water provider suits as the first case type for bellwether discovery, with other suit types to follow. The types of claims vary—ranging from water providers suits, to firefighters alleging exposure to AFFF during firefighting operations, to state attorneys general suing on behalf of states due to the contamination of natural resources and other damages, to private landowners alleging their soil or water are contaminated with PFAS or PFOA.[1] And within each category of

---

[1] Tyco has also been sued in other forums. For example, Tyco has been sued by plaintiffs seeking recovery resulting from the release or discharge of PFAS or PFOA from Tyco's manufacturing and training facilities in Marinette, Wisconsin. Tyco's Amended Complaint before this Court identifies the suits at issue in this case as those suits "pending in a multi-district litigation, or 'MDL' before the Honorable Richard M. Gergel in this Court." [ECF No. 33, ¶ 3] and later alleges "[t]he AFFF Suits are pending in the Multidistrict Litigation Court in South Carolina." [ECF No. 33, ¶ 39]. Therefore, TIG does not understand Tyco's summary judgment motion to address cases that are not pending before the MDL. *See*, *e.g.*, [ECF No. 256-1, pp. 7-8 ("Here, all of the underlying complaints include product liability allegations that AFFF caused bodily injury and property damage as a result of its use by *Tyco's customers* in firefighting or training activities, *after* it was manufactured and sold and *after* it had entered the stream of commerce and left any of the 'premises' mentioned in Paragraph 1")].

suit, the operative facts and issues vary significantly. The only claim type that has undergone any form of substantial discovery is the water provider claim type, and even there, only a handful of those claims have undergone bellwether discovery. Discovery is undeveloped in the other claims.

The water provider claims fit squarely within multiple provisions in the TIG Pollution Exclusion. Water providers seek recovery for testing, monitoring, and treating water contaminated with PFAS – a waste by-product – in order to comply with federal and state laws regarding drinking water standards. The claims fall squarely within the exclusion language, excluding "any loss cost, or expense arising out of any . . . request, demand or order that any insured or others" test for, monitor, clean up, treat, "or in any way respond to or assess the effects of pollutants." (Ex. A, TIG Policy, p. 11, ¶ 2.a). Also, the water provider plaintiffs consist of government authorities such as cities, towns, village, districts, etc., who seek costs for testing, monitoring, and treating water sources contaminated by Tyco's chemicals. The state attorneys general suits are the same—suits by governmental authorities seeking damages for testing for, monitoring, treating or otherwise responding in any way to PFAS pollution. Thus, the claims fall within the exclusion language for "[a]ny loss, cost, or expense arising out of any . . . claim or suit by [or] on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of pollutants." (Ex. A, TIG Policy, p. 11, ¶ 2.b).[2]

The other claim types are not adequately developed at this time to determine whether they do or do not fall within the TIG Pollution Exclusion. Simply put, discovery has not taken place to identify the means by which those claimants were exposed to PFAS. The parties and the Court

---

[2] As discussed below, other provisions in the pollution exclusion also apply.

have no way of testing the facts of those underlying suits to determine whether the exclusion applies—rendering Tyco's Motion woefully premature.

## FACTS

### A. The TIG Policy does not include a duty to defend, and there has not been exhaustion of underlying policies.

TIG issued Excess Umbrella policy number XLX 914 12 65 to Tyco International, Ltd with effective dates of July 1, 1997 to July 1, 1998 ("TIG Policy"). The TIG Policy lists limits of $30 million, in excess of underling limits of $90 million, in excess of primary insurance. (Ex. A, TIG Policy, p. 4).

TIG has no duty to defend—now or in the future. The TIG Policy provides: "███████

████████████████████████████████████████████████████████████

████████████████████" (*Id.* at p. 14).

Likewise, TIG has no current duty to pay any amounts under the TIG Policy, and it may never be obligated to do so. The TIG Policy states:



(*Id.* at p. 14). Thus, the TIG Policy applies only: (1) in excess of <u>all</u> underlying insurance ($90 million, which in turn is excess of primary insurance); (2) after all underlying insurance has been exhausted, and then only if the underlying insurance was exhausted by payment of limits for losses arising out of occurrences covered by all underlying insurance.

Tyco has not provided any evidence that the underlying insurance has been exhausted.

█████████████████████████████████████████████████████████████.

(Ex. B, Craig Bartol Dep. 342:15-19). Tyco also has not presented evidence to the Court in its Motion showing that coverage applies under each underlying insurance policy or that those policies have paid limits for losses arising out of covered occurrences. Thus, coverage under the TIG Policy is not implicated at this time.

The TIG Policy includes a "Pollution Exclusion Amendatory Endorsement (E) Named Peril Exceptions" (hereinafter "TIG Pollution Exclusion") (Ex. A, TIG Policy, pp. 11-12). The TIG Pollution Exclusion is broken down into two paragraphs, and then the exclusion has a narrow exception to the exclusion in paragraph 3.

Paragraph 1 provides:



(*Id.* at p. 11). Undoubtedly, this Paragraph applies to certain claims against Tyco, such as those brought by plaintiffs alleging contamination resulting from the release, seepage, etc. of PFAS chemicals[3] from Tyco's manufacturing, testing, and training facilities in Marinette, Wisconsin. These pollutants came " ███████████████████████████████████████

████████ " by Tyco, as just one example. To the extent that Tyco tries to include any such claims in its term "AFFF Claims," then this exclusion applies.

Paragraph 1.b. applies to any " ██████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ "

(*Id.*). The individual claimants, water providers, and state attorneys general suits seek recoveries for PFAS that migrated after AFFF waste was discharged into groundwater and/or municipal wastewater treatment systems. In fact, Tyco <u>instructed</u> its customers that they could dispose of AFFF into municipal waste water systems.

Water provider cases—which have undergone the most substantial discovery to date in the MDL—also fall within Paragraph 2 of the TIG Pollution Exclusion:

---

[3] The TIG Policy defines "Pollutants" to include " ████████████████████████

████████████████████████ (*Id.* at p. 15). For purposes of its Motion for Summary Judgment, Tyco assumes that PFAS constitutes a "pollutant" under the policies, apparently saving that fight for another day. [ECF No. 256-1, p. 6 (stating that Tyco's motion assumes for the sake of argument that AFFF is a "pollutant" and the use of AFFF qualifies as an "escape" or "release"). Multiple government agencies have identified PFAS chemicals as "contaminants." Also, after AFFF has been used in training or firefighting exercises, it becomes waste.



(*Id.* at p. 9). This Paragraph excludes any loss, cost or expense arising out of any " ███████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ " (*Id.*). The Paragraph also excludes any " ███████████████████████████████████████████████████████████ █████████████████████████ (*Id.*). Water providers—consisting of governmental authorities in the form of towns, cities, villages, and quasi-governmental entities—seek to recover costs for testing, monitoring, and treating water and soil contaminated with PFAS, testing and treatment that will be necessary to comply with federal and state environmental laws. Likewise, the state attorneys general claims fall within this exclusion, and at least some Private Party Claims will.

**B. Tyco produced AFFF products that are alleged to contain PFAS chemicals or chemicals that degrade into PFAS—a contaminant.**

"Per- and polyfluoroalkyl substances (PFAS) are a large class of thousands of synthetic chemicals that have been in use in the United States and around the world since the 1940s." https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_ 4.8.24.pdf, p. 18). As this Court has previously recognized in the MDL, "PFOA and PFOS represented a new class of man-made chemical compounds . . .." *In re Aqueous Film-Forming Foam Products Liability Litigation*, 2022 WL 4291357, *2 (D.S.C. Sept. 16, 2022).

Tyco admits that the underlying plaintiffs "generally alleged that AFFF contains or breaks down into PFAS compounds . . .." [ECF No. 256-1, p. 7]. The EPA has determined that PFOA and PFOS, along with other PFAS, are contaminants. On April 10, 2024, the EPA announced its final National Primary Drinking Water Regulation (NPDWR) for six PFAS. https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas. The NPDWR establishes maximum contaminant levels ("MSLs") for PFOA of 4.0 parts per trillion with a goal of zero, and 4.0 parts per trillion for PFOA with a goal of zero. *Id.*

Water providers must complete initial monitoring for these chemicals over the next three years and then continue monitoring thereafter. *Id.* Within five years, water providers must implement solutions to reduce PFAS if monitoring shows that drinking water levels exceed these MCLs. Also, beginning in five years, any water system with PFAS levels in excess of the MCLs will have to take action to reduce those levels and provide the public notice of the violations. *Id.* Thus, the EPA considers PFOA and other PFAS to be contaminants, and water providers are required by federal regulations to monitor and treat for PFAS.

## STANDARD OF REVIEW

"The movant has the burden of showing that there is no genuine issue of fact…." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S. Ct. 2505, 2507, 91 L. Ed. 2d 202 (1986). "Accordingly, the moving party must negate any material issue of fact…." *HealthSouth Rehab. Hosp. v. Am. Nat. Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). As the Fourth Circuit has admonished:

> It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. Neither should summary judgment be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions. Burden is upon party moving

> for summary judgment to demonstrate clearly that there is no genuine issue of fact,
> and any doubt as to the existence of such an issue is resolved against him.

*Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967) (citations omitted). "[S]ummary judgment under Rule 56 should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Id.*

"Generally speaking, 'summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson*, 477 U.S. at 250 n.5, 106 S. Ct. at 2511 n.5). A liability insurer's duty to indemnify is determined by the findings of fact in the underlying case. *Ellet Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388–89 (4th Cir. 2001). When factual issues relevant to an exclusion are underdeveloped, summary judgment as to that exclusion is not appropriate. *See, e.g., Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 758, 765 (E.D. Va. 2011) (denying insured's motion for summary judgment seeking declaration that exclusion did not apply because there was insufficient factual development of element of exclusion at this stage of the case); *Bullock v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Pa., No. CV 3:03-2261-17, 2005 WL 8163375, at \*4 (D.S.C. Jan. 24, 2005); *State Farm Fire & Cas. Co. v. Nivens*, No. CIV.A. 0:12-00151, 2013 WL 4080703, at \*6 (D.S.C. Aug. 12, 2013).

"In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *see also Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511 ("[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## CHOICE OF LAW

To avoid unnecessary duplication, TIG adopts and incorporates by reference AIG's arguments regarding choice of law.

## ARGUMENT

**I.    The issue of whether the TIG Pollution Exclusion applies to the underlying suits is not ripe for adjudication.**

TIG has no duty to defend – "███████████████████████████████████

████████████████████████████████████" (Ex. A, TIG Policy, p. 12). In fact, the principal issue in this case is indemnity, not defense. The rule in this District is well established that questions of an insurer's duty to indemnify are not ripe until factual determinations have been made in the underlying lawsuits. *See*, *e.g.*, *Ellet Bros., Inc. v. U.S. Fidelity & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001) ("Because no findings of fact have been made in the [underlying] lawsuits . . . the indemnity claim is not ripe . . ..").

This Court itself has followed this well-established rule. *See FCCI Ins. Co. v. Island Pointe, LLC*, 2018 WL 11000484, *3 (D.S.C. Feb. 23, 2018) ("As this Court ruled in its prior Order, no factual findings have been made in the Underlying Action, so a determination of whether any party has a duty to indemnify is not ripe for this Court's consideration.") (citing *Certain Underwriters at Lloyd's London v. Butler*, 2017 WL 570024, at *4 (D.S.C. Feb. 13, 2017) (observing that,

generally, a determination of whether an insurer has an affirmative duty to indemnify is not ripe for adjudication until factual findings are made in the underlying lawsuit)).[4]

The ripeness issues are especially problematic in this case. Not only have there not been factual determinations in the underlying lawsuits, but discovery has not even meaningfully commenced. The only suits that have undergone fulsome discovery are a few water provider bellwether suits.[5] The vast majority of other water provider suits, the firefighter suits, the state attorneys general suits, and the private party suits remain in their relevant infancy. In fact, the Court ordered selection of the initial bellwether discovery pool for personal injury claimants on October 2, 2023. (Ex. C, Amendments to Second Bellwether Program: Initial Personal Injury Claims, ECF No. 3753, C/A No. 2:18-mn-02873-RMG).

The ripeness issue is even more apparent when applied to a high-level excess umbrella policy. The TIG Policy is not implicated unless a litany of hypothetical events take place in the future, including: (1) coverage applying under all underlying insurance; (2) exhaustion of underlying limits by payment of limits for covered occurrences; and (3) an ultimate net loss against Tyco in excess of all underlying insurance. At this stage, it is unclear whether the TIG Policy will ever be implicated. An opinion from this Court on application of the pollution exclusion is purely advisory.[6] Therefore, Tyco's Motion as to the TIG Pollution Exclusion is premature, not ripe, and

---

[4] Even if the TIG Pollution Exclusion did not apply, TIG contends there would be no coverage under the TIG Policy for numerous other reasons, including lack of proper exhaustion of underlying policies, lack of a covered occurrence, and expected or intended injuries, among others.

[5] Tyco is an alleged telomer defendant. The Court entered its Telomer AFFF Bellwether Program order on September 13, 2023. (ECF No. 3665, C/A No. 2:18-mn-02873-RMG).

[6] "[F]ederal courts are prohibited from issuing advisory opinions." *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 201 (4th Cir. 2012). That courts may not issue advisory opinions is one of the most long-standing and well-settled jurisdictional rules, reflected as early as 1793 when the

lacks the necessary factual record for the Court to make a determination, much less a broad-sweeping rule that the pollution exclusion would not apply to <u>any</u> underlying claims – the relief Tyco seeks in its Motion.

As the Fourth Circuit aptly stated in *Trustgard Ins. Co. v. Collins*, just "because a federal court could exercise jurisdiction under the Declaratory Judgment Act does not mean that it should." *Trustgard Ins. Co.*, 942 F.3d at 204. The Fourth Circuit has found that it is an abuse of discretion for a district court to issue an advisory opinion on indemnification before critical facts are determined in the underlying case. *See id*. Following *Trustguard*, this Court should refrain from issuing an advisory opinion on the TIG Pollution Exclusions impact on whether TIG may ultimately owe a duty to indemnify.

## II.    The water provider suits fall within multiple paragraphs of the TIG Pollution Exclusion.

The water provider suits fit squarely within three separate portions of the TIG Pollution Exclusion. First, Paragraph 2.a. excludes coverage for ███████████████████████ ████████████████████████████████████████████████████ ████████. Various water providers are required by state and federal law to test for PFAS in their water systems and—under federal law—will be required to treat water that contains PFAS in excess of 4.0 parts per trillion. The EPA regulations are mandatory and trigger paragraph 2.a. of the TIG Pollution Exclusion. Prior to the EPA's enactment of its final regulation—which the parties in the MDL and water providers generally have been anticipating for years—individual

---

Supreme Court refused to render an advisory opinion for President Washington. *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201 (4th Cir. 2019) (finding district court abused its discretion in reaching the merits of a declaratory judgment action based on a "thin and ambiguous record" before the underlying lawsuit was resolved).

states also enacted requirements for monitoring or treating water. Water providers seek recovery for the loss, cost and expense arising out of those requirements, triggering the exclusion.

Second, the water provider suits are brought by governmental authorities who provide these water services and seek damages for the costs of testing for, monitoring, and removing or otherwise responding to PFAS contaminants. These claims trigger Paragraph 2.b. of the TIG Pollution Exclusion.

Third, water providers—like state attorneys general and individual claimants—allege PFAS-contaminated AFFF waste migrated through groundwater, surface water, and municipal waste treatment facilities, ultimately injuring the underlying plaintiffs or requiring testing, monitoring, and treatment. ████████████████████████████████ ███████████████████████████████████████████████████.

### A.  Water provider claims to test for, monitor, and treat or otherwise respond to PFAS contamination fit squarely within Paragraph 2.a. of the TIG Pollution Exclusion.

On April 10, 2024, the EPA announced its final NPDWR for certain PFAS chemicals, including PFOA and PFOS on April 10, 2024.[7] The NPDWR includes MCLs for PFOA and PFOS of 4.0 ppt. Water providers are required by federal law to monitor for PFAS in the next three years and going forward thereafter.[8] Water providers whose water tests above the MCL "are required to make any necessary capital improvements and comply with the PFAS MCLs" within five years after the publication date in the federal register. *Id.* Thus, testing and monitoring for PFAS is not

---

[7] Pre-Publication Federal Register Notice: Final PFAS National Drinking Primary Drinking Water Regulation (pdf), available at https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf.

[8] *Id.* at p. 7 ("Consistent with the timeline set out under SDWA, PWSs are required to conduct their initial monitoring by [three years from publication in the Federal Register] and to conduct PN and include PFAS information in the CCR").

optional for water providers: it will be mandatory. Likewise, treating water systems contaminated

with PFAS (at least above the 4.0 ppt level) will be mandatory. Regulations are a form of order –

in this case, one applying to all water providers—such that the EPA does not have to issue

individual orders to each and every water provider. Courts across the country recognize that the

two terms are synonymous.[9]

Tyco may attempt to argue that water providers who brought suit prior to the enactment of

the final rule were not seeking amounts based on a ███████████████████████████

█████" perform testing or treatment actions. However, this argument would fail for multiple

reasons.[10] When the EPA announced its final rule, no water provider action had proceeded to

---

[9] *See United States v. Storer Broadcasting Co.*, 351 U.S. 192, 196 (1956) (reading statute permitting court to review an agency "order" as authorizing court to review agency regulation); *Leipart v. Guardian Industries, Inc.*, 234 F.3d 1063, 1070 (9th Cir. 2000) ("We believe that the term 'regulations', as used in § 2051, is synonymous with the terms 'standards', 'regulations', 'rules,' and 'orders', as used in the pre-emption and saving clauses"); *U.S. v. Townsend*, 46 M.J. 517, 518 n.1 (U.S. Coast Guard Ct. of Crim. Appeals 1997) ("For purposes of this decision, general 'regulation' and 'order' are treated synonymously"); *People v. Cull*, 10 N.Y.2d 123, 127, 176 N.E.2d 495, 497 (1961) ("Thus, in 1938, in discussing the new section 8 of article IV, which was ultimately adopted, members of the Constitutional Convention referred to orders, rules and regulations as synonymous terms"); *Owner-Operator Independent Drivers Ass'n v. Mayflower Transit, Inc.*, 161 F. Supp. 2d 948 (S.D. Ind. 2001) ("In addition, the terms 'order' and 'regulation' are sometimes construed synonymously, so that, for example, a statute providing for judicial review of an agency 'order' may be construed to apply to 'regulations' issued by that agency"); *Merriam-Webster Dictionary:* Regulation ("a rule or order issued by an executive authority or regulatory agency of a government and having the force of law") (and listing term "order" as a synonym).

[10] Testing for many water providers has been required by federal or state regulations and laws for years. *See, e.g.*, 40 C.F.R. § 141.40 (establishing monitoring requirements for PFOS, PFOA, and other PFAS for certain water providers); Cal. Health & Safety Code § 116378 (authorizing state board to order public water systems to monitor for perfluoroalkyl and polyfluoroalkyl substances). Even without the EPA's final rule, multiple states had already or were in the process of establishing MCLs for PFAS. *See, e.g.* N.H. Rev. Stat. § 485:16-e (setting MCLs for PFOA, PFOS and other PFAS); Va. Code § 32.1-169 ("The Board shall adopt regulations establishing maximum contaminant levels in all water supplies and waterworks in the commonwealth for" PFAS "as the Board deems necessary"). ████████████████████████████████████████████████████████

judgment. It strains credulity to believe that a water provider would not raise the regulatory requirements in its case, and any cleanup or testing by a water provider is inevitably going to be mandatory. Moreover, the EPA's rulemaking process for MCLs for PFAS has been one of the most widely publicized rulemaking processes in recent history, with news sources such as CBS, PBS, Bloomberg, BBC, PBS, and numerous other news entities reporting on the anticipated regulations and their potential impact on water providers. Water providers—especially those in the MDLs—have been making plans for treating their water specifically with the intent to do so in a way that will satisfy the inevitable EPA rules.

Moreover, even before the EPA announced its final regulation, testing for many water providers had been required by federal or state laws for years. *See, e.g.*, 40 C.F.R. § 141.40 (establishing monitoring requirements for PFOS, PFOA, and other PFAS for certain water providers); Cal. Health & Safety Code § 116378 (authorizing state board to order public water systems to monitor for perfluoroalkyl and polyfluoroalkyl substances). Likewise, without the EPA's final rule, multiple states had already established, or were in the process of establishing, MCLs for PFAS. *See, e.g.* N.H. Rev. Stat. § 485:16-e (setting MCLs for PFOA, PFOS and other PFAS); Va. Code § 32.1-169 ("The Board shall adopt regulations establishing maximum contaminant levels in all water supplies and waterworks in the commonwealth for" PFAS "as the Board deems necessary"). ████████████████████████████████████████
████████████████████████████████████████████. (Ex. E, Sioux Falls 30(b)(6) Cotter Dep. 99:8-100:11).[11]

---

████████████████████████████████████████████. (Ex. D, Sioux Falls 30(b)(6) Graverson Dep. 249:7-250:3).

[11] Due to the early stages of discovery in the other water provider cases, it is impossible at this early stage to know how many other water providers fall into this category.

To be sure, many water providers specifically allege compliance with regulatory requirements as the basis for their claims. For example, the Monson Water and Sewer Department alleged that, "to ensure compliance with all regulatory standards established by the State of Massachusetts, Plaintiff has and will have to incur . . . significant costs related to PFAS testing and monitoring, and take remedial actions designed to mitigate the contamination levels at the MWSD's water distribution system." (Ex. F, Compl., ¶ 206, *Monson Water and Sewer Dept. v. The 3M Co., et al*, 2:18-mn-2873-RMG).

With the new federal regulations, every water provider will be required to test and monitor for PFOS and PFOA, and any water provider with levels exceeding an MCL will be required to remediate the issue. These are the very damages sought by the water providers. Paragraph 2.a. applies to those suits ███████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████. (Ex. A, TIG Policy, p. 11). The water provider complaints routinely and unambiguously seek damages to treat and test for PFAS and PFOA contaminants and to clean up, remove, contain, treat, "███████████████████████ ████████████":

> The City brings this action in order to address contamination of its wells caused by . . . PFAS . . . PFOA
>
> ***
>
> Plaintiffs seek the cost of remediating the contamination, restoring its contaminated drinking water systems and supply wells that have been, and continue to be, contaminated by PFOS and PFOA related to the manufacture and use of AFFF, and the costs of treating the water produced by the subject wells to remove the PFOS and PFOA.

(Ex. G, Compl. ¶¶ 3 & 9, *City of Sioux Falls v. 3M Co., et al*, 2:19-cv-1806-RMG). This claim is typical and representative of the water provider complaints.

At the summary judgment stage, Tyco attempts to have this Court rule as a matter of law that <u>all</u> "AFFF Claims" fall outside of the TIG Pollution Exclusion. Tyco's Motion must be denied. Water providers seek recovery for loss, cost, and expenses arising out of their obligations to test for, monitor, and respond to PFAS and PFOA, i.e., pollutants. Those obligations come in the form of federal and state laws and rules. Thus, Paragraph 2.a. of the TIG Exclusion applies to the water provider claims.

**B. The water provider cases selected for bellwether discovery and trial confirm that the vast majority of water provider claimants are governmental authorities seeking damages for testing for, monitoring, and treating or otherwise responding to PFAS contamination, which fit squarely within Paragraph 2.b. of the TIG Exclusion.**

Paragraph 2.b. of the TIG Pollution Exclusion applies to any "███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████"

(Ex. A, TIG Policy, p. 11).  The majority of the water providers are governmental authorities. As a few examples from the bellwethers—which by design are intended to be representative cases[12]—plaintiffs included the City of Stuart, Florida, the City of Dayton, the City of Sioux Falls, the Town of Ayer, the Village of Farmingdale, and the City of Watertown – all governmental authorities. In fact, Tyco even identifies underlying plaintiffs as "governmental authorities" in its Amended Complaint: "Tyco Fire Products has been named as a defendant in suits brought by individual claimants, including . . . public, quasi-public, and private water providers, **state and municipal governmental authorities** and others . . .." [ECF No. 33, ¶ 3] (emphasis added). As but one example, the Village of Farmingdale alleges that it "functions as a full governing organization in

---

[12] *See*, *e.g.*, Case Management Order No. 26A, ¶ 3, ECF No. 3753, 2:18-mn-02873-RMG (instructing parties to "select representative cases" for bellwether discovery); (Ex. H, ECF No. 3665, p. 3, C/A No. 2:18-mn-02873-RMG) ("The PEC and the Defendants have used their best efforts to select representative 'Telomer Water Provider Cases.'").

charge of all operations and facilities within its jurisdictional region" and that it "maintains a Water Department that provides public water supply to its residents," which "functions under the supervision of the Public Works Department." (Ex. I, Village of Farmingdale Complaint, ¶¶ 2-3).

These governmental authorities have filed suits against Tyco for damage because of



" *See* (Ex. A, TIG Policy, p. 11).

Again, the allegations in the Village of Farmingdale Complaint are representative and plainly fall within the exclusionary provision:

> 9. Defendants are the direct and proximate cause for the contamination of Plaintiff's groundwater supply by Defendants' aqueous film forming foam ("AFFF") that contained per- and poly-fluoroalkyl substances ("PFAS"), which included but not were limited to perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"), that were manufactured, sold, distributed, purchased, transported, used, processed, mixed, stored, handled and/or disposed of by Defendants.

> 10. Plaintiff is now forced to incur significant costs for the design, construction, operations and maintenance of treatment systems to clean the water of the toxic and carcinogenic chemicals that were contained in Defendants' AFFF.

> 15. Plaintiff will also incur additional costs to sample their water for PFAS for the next one hundred (100) years, that they otherwise would not have to incur.

(Ex. I, Village of Farmingdale Complaint, ¶¶ 9-10 & 15). In frank terms, the water providers seek damages for "



" pollutants, namely PFAS. Therefore, Paragraph 2.b. applies. At a minimum, Tyco has failed to show a lack of material issues of fact.

**C. Water providers allege damages for the discharge, dispersal, seepage, migration, and release of pollutants as waste.**

The source of contamination alleged by water providers is simple: parties used AFFF and, rather than clean it up properly, disposed of the AFFF waste by simply abandoning it, washing it away into soil, groundwater or surface water, or discharging it into municipal waste water treatment systems. The TIG Pollution Exclusion excludes coverage for damages "███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████" (*Id.*)

(emphasis added). This is the source of PFAS alleged by water providers, state attorneys general, and individual claimants, and the resulting damages fall within the plain exclusionary language of Paragraph 1.b.

After AFFF has been discharged, it is waste. It has no more use, and it must be dealt with. Users of the AFFF or others must decide how to handle, dispose, or process the waste from the site, location or premises where the AFFF waste is located. ████████████████████████

████████████████████████████████████████████████. (Ex. J, Tyco 30(b)(6) Vermeulen Dep. 120:2-11); (Ex. K, TFP-INS00212429); (Ex. L, TFP-INS00192040). It is this very practice that allegedly led to the migration of PFAS to water provider facilities and other property owned by various claimants in the underlying lawsuits. The representative allegations in the City of Sioux Falls Complaint adequately encompass this fact pattern:

> Notwithstanding their respective knowledge of the dangers involved with AFFF containing PFOA and/or PFOS, Defendants negligently and carelessly . . . issued instructions on how AFFF should be used and disposed of (namely, by washing the foam into the soil and/or waste water disposal systems), thus improperly permitting PFOA and/or PFOS to contaminate soil and groundwater [and] failed to recall and/or warn users of AFFF . . . of the dangers of soil and

groundwater contamination as a result of the standard use and disposal of these products . . ..

(Ex. M, Compl. ¶¶ 80, *City of Sioux Falls v. 3M Co., et al*, 2:19-cv-1806-RMG).

The Wisconsin Supreme Court has given the terms "discharge, dispersal, seepage, migration, release or escape" a broad construction that is consistent with the intent of the pollution exclusion to apply broadly, finding these words "appear to describe the entire range of actions by which something moves from a contained condition to an uncontained condition." *Peace ex rel. Lerner v. Northwestern Nat. Ins. Co.*, 228 Wis. 2d 106, 126, 496 N.W.2d 429, 438 (1999) (finding plain language of pollution exclusion covered release of paint containing lead from a wall or ceiling into the air or onto the floor). "This implies that the movement from a contained condition to an uncontained condition can be either intentional and purposeful or accidental and involuntary." *Id.*

As Judge Seymour held in *Ross Development Corporation v. Fireman's Fund Insurance Company*, 910 F. Supp. 2d 828, 835 (D.S.C. 2012), discharge or dispersal of waste materials onto the ground "constitutes a discharge, dispersal or release of . . . waste materials." In *Ross Development*, Judge Seymour found pyrite slag generated as a byproduct of fertilizer production was "waste" even though it was subsequently used to line roadbeds and fill in low-lying areas at a site, rejecting the idea that waste must be completely useless or valueless. *Id.* at 835-36. The discharge of the slag onto the soil – regardless of whether it was intentional or unintentional – constituted the sort of release or discharge that fell within he plain language of the pollution exclusion.

Here, there is no argument that spent AFFF was anything other than waste. Users of AFFF disposed of that waste by washing it away, either in the soil, in nearby groundwater, or down the drain, and those chemicals subsequently made their way (seeped and/or migrated) to plaintiffs or

their property.[13] [14] In fact, had firefighters and other users of Tyco's products been properly instructed to contain AFFF waste after its use, then the PFAS chemicals never would have migrated to water providers and the property of other landowners. Thus, exclusion 1.b. applies.

### III.    The States Attorney General Claims fit squarely within Paragraph 2.b. of the TIG Pollution Exclusion.

In addition to being sued by numerous towns and other governmental authorities that provide water services (identified by Tyco as water provider suits), Tyco has also been sued by various attorneys general for similar damages, which Tyco identifies in its memorandum as "State Attorney General Claims." [ECF No. 256-1, p. 3]. Unsurprisingly, Tyco identifies this category of "AFFF Claim," on page three of its memorandum, but never references it again. It is difficult to imagine how Tyco could argue that suits by state attorneys general would not be suits "by [or] on behalf of a governmental authority . . .." (Ex. A, TIG Policy, p. 11). Like the water provider suits, these suits allege damages for the testing, monitoring, and response to PFAS contamination—all claims that fall within Paragraph 2.b. of the TIG Pollution Exclusion.

### IV.    Facts have not been sufficiently developed in the MDL or underlying lawsuits to determine whether the TIG Pollution Exclusion applies to some individual bodily injury or property owner claims.

It is too early to tell whether the TIG Pollution Exclusion will apply to certain other underlying claims. For example, if private parties seek damages for the cost of complying with governmental requests, demands or orders to test for, monitor, etc., "███████████████████ ███████████████" pollutants, then the exclusion would apply. But due to the lack of discovery

---

[13] More broadly, this also applies to all underlying claims to the extent the source of PFAS contamination was the discharge or dispersal of AFFF as waste after it was used in firefighting or training exercises. This appears to be the source of PFAS contamination alleged by most categories of claimants.

[14] Some plaintiffs may be owners of that same land on which they disposed of the AFFF waste. Again, the exclusion would apply to their claims as well.

in the underlying lawsuits, there is no way for the parties or this Court to make that determination now. It is for this very reason that courts in this Circuit do not tread into the advisory and speculative world of making rulings on the duty to indemnify before facts have been established in underlying lawsuits. *See Trustgard Ins. Co.*, 942 F.3d at 204. Doing so asks this Court to gaze into a cloudy crystal ball and divine things not yet seen. That is not the role of the Court.

It is not difficult to imagine factual scenarios in the undeveloped, underlying lawsuits that would fall within the TIG Pollution Exclusion. For example, Paragraph 1.a. excludes ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████" (Ex. A, TIG Policy, p. 11). Thus, if a firefighter was exposed to Tyco's AFFF during a training exercise at Tyco's Marinette training facilities or another facility owned, occupied, rented or loaned to Tyco, then the exclusion would apply—the firefighter would be claiming bodily injury arising out of the discharge or dispersal of AFFF at or from a premises owned, occupied, rented or loaned to Tyco.

Likewise, a firefighter may claim that he or she was exposed to Tyco AFFF during a demonstration performed by a Tyco employee or "███████████████████████████████

████████████████████" Tyco's behalf while performing training operations away from Tyco's facilities. This could trigger Paragraph 1.d.

Certainly, many individual claimants will claim their property was contaminated with PFAS that emanated from a "████████████████████████████████████

██████████████████████████████████████████████." (*Id.*) (emphasis added). This is the source of PFAS alleged by water providers, state attorneys general, and individual claimants. For the same reasons discussed above in Section II.C. with respect to

water providers, Paragraph 1.b. of the TIG Pollution Exclusion will apply to individual claimants. Moreover, some individual claimants may also assert damages based on a requirement that they treat for or remediate PFAS contamination, which would trigger Paragraphs 2.a or 2.b. of the TIG Pollution Exclusion.

It is simply too early for summary judgment on application of the TIG Pollution Exclusion to other claims. Facts have not been developed. The source and history of PFAS that allegedly injured these other types of claimants or their property is unknown, and that information is necessary to make a determination as to the application of the exclusion to those suits. Given the unknown underlying facts, any opinion on the duty to indemnify at this stage would be an impermissible advisory opinion. Tyco bears the burden of showing this Court there are no material issues of fact, and it has failed to do so.

### V.    Tyco's improper parol evidence arguments that the TIG Pollution Exclusion does not apply to product liability claims ignores the fact that the TIG Pollution Exclusion expressly excepts certain products liability claims—just not any that apply here.

Tyco argues that, despite the plain language of the exclusion, the Court should look beyond the unambiguous policy terms and rely on parol evidence (discussing other policy forms) to hold that the TIG Pollution Exclusion does not apply to "product liability claims." Under well-established law, the Court cannot resort to parol evidence when the terms of a contract are unambiguous. The Wisconsin Supreme Court has expressly rejected arguments by insureds that courts should limit pollution exclusions to traditional environmental claims. *See Peace ex rel. Lerner v. Northwestern Nat. Ins. Co.*, 228 Wis. 2d. 106, 596 N.W.2d 429 (1999) ("Throughout the county, injured parties and insured parties have resorted to the history of the pollution exclusion clause in an effort to show that it was intended to apply to industrial pollution and that the terms 'discharge,' 'dispersal,' 'release,' and 'escape' are environmental terms of art. … The problem in

23

dealing with this argument is that it calls for construction of the pollution clause based on materials outside the four corners of the policy").[15]

In fact, the TIG Pollution Exclusion <u>does</u> have a limited exception for some products liability claims, just not the claims at issue in this case. Paragraph 3 of the TIG Pollution Exclusion provides:



(Ex. A, TIG Policy, p. 12) (emphasis added). Thus, the TIG Pollution Exclusion specifically carves out a limited exception for products – complete operations hazards, but <u>not</u> for Paragraphs 2.a and 2.b (or 1.b and 1.c) of the TIG Pollution Exclusion. The fact that Paragraph 3 provides limited exceptions for some paragraphs and not others shows that the parties understood the TIG Pollution Exclusion was designed to apply to products claims for all situations except those identified in Paragraph 3.

## CONCLUSION

For the above-stated reasons, Tyco's Motion for Summary Judgment should be denied. As to water provider and state attorneys general claims, Paragraphs 1.b, 2.a., and 2.b. of the TIG Pollution Exclusion apply according to their plain terms. Some or all of those Paragraphs apply to

---

[15] Even if South Carolina law controlled this question, South Carolina courts are in accord on this rule. *See Rodarte v. University of South Carolina*, 419 S.C. 592, 603, 799 S.E.2d 912, 917 (2017) ("The parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary, or explain the written instrument." (citation omitted)). Moreover, Tyco has not presented evidence of the intent of the parties to the TIG Policy in support of its contentions, and it cannot impute intent from non-parties.

other claim types as well. However, discovery in the remaining cases has barely started, and there is inadequate information for the parties or the Court to make a determination as to the exclusion's application. Put simply, Tyco's Motion is unripe, premature, and this Court should refrain from issuing an impermissible advisory opinion. At a minimum, Tyco has failed to meet its burden to show that there is no genuine issue of material fact as to every single one of the underlying lawsuits. Finally, Tyco's argument that the TIG Pollution Exclusion was never intended to apply to products claims ignores the plain language of the TIG Pollution Exclusion. In fact, the exclusion provides a specific exception for a limited category of products claims. By stating what products claims do not apply to the exclusion, the TIG Pollution Exclusion makes clear that the remainder of the exclusion does apply to products claims. Therefore, TIG respectfully requests that Tyco's Motion be denied.

MURPHY & GRANTLAND, P.A.


*s/Wesley B. Sawyer*
Wesley B, Sawyer, Esquire
SC Federal Bar No. 11244
P.O. Box 6648
Columbia, SC 29260
Phone: 803-782-4100
Fax: 803-782-4140
wsawyer@murphygrantland.com
*Attorneys for Defendant TIG Insurance Company*

Columbia, South Carolina
April 15, 2024